## Commonwealth v. Hamilton

*Russell H. Adams,* district attorney, and *Louis L. Kaufman,* assistant district attorney, for Commonwealth.

*Frederic G. Weir,* for defendant.

McDONALD, J., January 6, 1945.—This court in banc has before it a motion to quash the indictment in the above-entitled case. The reasons assigned in support of such motion are: (1) Defendant is a man, and a man may not be indicted or convicted as a "common scold"; and (2) the indictment alleges that the offense occurred on a single certain day specified (to wit, July 24th), and any type of nuisance which is indictable as a common nuisance must have occurred upon more than one occasion.

A "common scold" is indictable as a common nuisance, but in order to sustain a conviction for any type of "common nuisance" there must be proof that the offense occurred on more than one or two, or even a few,

isolated instances. In fact, the proof must be that defendant's conduct happened so frequently as to be almost habitual. The frequency must have been so great as to justify a reasonable person in expecting that the objectionable conduct is likely to be repeated at any time. Hence, conduct which is offensive or objectionable to one or two, or a few people, would not constitute a "common nuisance" of any kind, and conduct which is objectionable or offensive to a considerable number of people, but which occurred on only one or two or a few isolated occasions, would not sustain a conviction of any type of "common nuisance".

To sustain a conviction of any type of "common nuisance" there must be proof that defendant's misconduct was so frequent or habitual that it disturbed the peace and repose of the neighborhood or tended to debauch the morals of the people of the neighborhood and that there is a likelihood that such misconduct will be repeated by defendant at any time. It follows, therefore, that an indictment for any type of "common nuisance" which alleges that the misconduct complained of happened on only one certain day is fatally defective and will be quashed. The proper way to fix the date in such type of indictment is to allege that on a certain date (specifying the date) "and on divers occasions before and after such date, the defendant did", etc. The proof to sustain a conviction on such an indictment must be of the quantity and quality hereinbefore indicated.

Our first impression of the contention that only a woman (and not a man) could be guilty of the common nuisance known as a "common scold" was that it was ridiculous and that surely a man could be a "common scold" just as certainly as could a woman. Our own experience has been that men can be just as "ornery" as women. Then, too, we are inclined to think, at first blush, that the common law of England (and of this Commonwealth) was developed during the days of knighthood, and that ordinary considerations of gal-

lantry and chivalry would dictate that no such crime would be limited to the feminine sex. However, when one stops to consider and to remember some of the shackles and limitations which were placed upon women in those days (some of which still remain), it is not surprising to learn that, at common law, the crime of "common scold" was limited to women. We know of no reason why this should be so, but when one reflects upon the generally degraded state of women at the time of the development of the great part of our common law it is not to be wondered at that the crime was restricted to women. At that time a woman was, in many respects, the servant or slave of her husband and not considered much more than any other chattel. It was held at common law that a husband might "correct" his wife with "a stick as thick as his own thumb", although tradition has it that when Bracton published his learned work in which it was pronounced that a husband could lawfully so correct his wife the women of the town in which he lived seized him and ducked him in a horse pond.

At common law, women were denied the benefit of clergy merely because their sex precluded them from holy orders, however learned they might be, while their more ignorant husbands were "burned" in the hand with a "cold" iron for offenses for which women were doomed to die on the gallows.

At common law, female virtue stood exposed to the slanders and malignity of falsehood, and anyone in conversation could, with impunity, proclaim the purest maid or chastest matron to be the most meretricious and incontinent of women. Thus, female honor, which we know is dearer to women than life itself, was left by the common law to be the sport of every malignant and abandoned calumniator. When we add to these instances of inequality between sexes the fact that at common law the scolding woman was to be "ducked" while the most scandalously abusive and railing man went entirely unpunished, the injustice becomes strik-

ing. Yet it was from this common law, with such unfairness and inequality between the sexes, that we derive our common-law crime of "common scold".

Since our legislature has seen fit to do nothing about the situation, if a man could not be punished as a "common scold" at common law he cannot now be so indicted or punished, for the simple reason that, except for the common law, we have no law on the subject. The offense still remains as at common law, and it follows that it is confined to the feminine sex until the legislature acts either to abolish the offense or to extend it so as to include the male of the species.

Of "common scold" Blackstone says (vol. 4, sec. 168) :

" 'Common scold' communis vixatrix, (for our law-Latin confines it to the feminine gender,) is a public nuisance to her neighborhood. For which offence she may be indicted, and, if convicted, shall . . . be placed in a certain engine of correction called a trebucket, castigatory, or cucking-stool, which, in the Saxon language, is said to signify the scolding-stool, though now it is frequently corrupted into ducking-stool, because the residue of the judgment is, that, when she is so placed therein, she shall be plunged into the water for her punishment." (Italics supplied.)

The trebucket consisted of a long beam or plank, at one end of which was attached a seat or bucket. It was attached near the center of the beam to a fulcrum, and in such manner that the end to which the seat was attached could swing out over a pond or pool of water and the seat or bucket (with its occupant) be plunged into the water.

Our ancestors in the common-law period prided themselves upon making the punishment exactly fit the offense. Thus, the punishment for spreading false rumors was to pull out the tongue of the guilty party, and it was thought fitting that a cook who was found guilty of poisoning should be boiled in oil as punishment for his crime. We cannot understand why it was

thought that "ducking" was the proper punishment for a "common scold". Certainly such a ducking would not serve to deter a real "scold" from scolding in the future. Neither would such a ducking serve to sweeten the disposition of a "scold". We can imagine the expletives likely to be uttered by a common scold after a real ducking. Nor can it be said that such a ducking served to "wash" the scold clean because it was usually provided that the "common scold" be ducked in stercore—that is, stagnant, stinking water.

The last person ever sentenced to a ducking as a "common scold" was one Nancy James. She was sentenced to be "placed in a certain engine of correction called a cucking or ducking stool on Wednesday, the third day of November next ensuing [1824] . . . and being so placed therein to be plunged three times into the water". In addition to being a "scold", Nancy James was a fighter. She carried her case to the Supreme Court and caused such a hue and cry to be raised that the Attorney General of the Commonwealth appeared before the Supreme Court and took part in the argument of the case upon appeal. The result was that the Supreme Court held that the crime of "common scold" still existed in the Commonwealth, although the punishment by "ducking" was by then obsolete, and that punishment should be by fine or by fine and imprisonment, in the discretion of the court. See James v. Commonwealth, 12 S. & R. 220.

Of the crime of "common scold" Justice Duncan said in the James case, supra (p. 226) : "It must strike all, as a peculiar feature of this offense, that it is of the *feminine* gender . . ."

Of "common scolds", Wharton says (sec. 1715) :

"When a *woman* is habitually addicted to scolding at and before persons in general, on the highway, or in a populous neighborhood, so as to disturb passersby, *she* may be indicted as a common scold, and it is enough if the indictment simply avers *her* to be such. Anger or

malice is not a necessary constituent of the offense."
(Italics supplied.)

Bishop's Criminal Law says (sec. 1101) :

"A common scold is an indictable common-law nuisance,—a doctrine derived by us from the law of England. The offence is generally regarded as confined to the female sex, but this probably has not been directly adjudged."

After making this statement, Bishop then continues to define a common scold as follows: "A common scold is a *woman*, who by the practice of frequent scolding disturbs the repose of the neighborhood."

II Russell on Crimes, p. 1336, states:

"*A common scold (communis vixatrix)* is a public nuisance to *her* neighbourhood, and may be indicted for the offense; and, upon conviction punished by fine and imprisonment, or by being placed in . . . ducking stool . . . scolding cart . . ." (Italics supplied.)

In the year 1866, it was again held that a "common scold" is indictable in Pennsylvania as a common nuisance. See Commonwealth v. Mohn, 52 Pa. 243. This last decision is of particular significance because it was rendered six years after the passage of the Criminal Code of 1860.

Shakespeare depicted a "common scold" very well in his "Taming of the Shrew", but we of Scotch extraction believe that Burns did even better in his description of the wife of Willie Wastle. Burns wrote as follows:

"Willie Wastle dwelt on Tweed
The spot they called it Linkumdoddie
Willie was a wabster gude
Could stoun a clue wi' ony body.

Hee had a wife was dour and din
Old Tinkler Maidgie was her mither
Sic a wife as Willie had
A wad na gie a button for her.

She has ai e'e she has but ane
The cat has two the very color
Five rusty teeth forby a stump.
A clapper tongue wad deave a miller.

A whiskin beard about her mou
Her nose and chin they threaten ither
Sic· a wife as Willie had
I would na gie a button for her.

She's bow-boughed, she's hen skin'd
Ae limpin leg a hand bried shorter
She's twisted richt, she's twisted left
To balance fair in ilka quarter.

Her wailie nieves like midden criels
Her face wad fyle the Logan water
Sic a wife as Willie had
I would na gie a button for her."

Synonyms for "common scold" are "termagant", "shrew", "virago", and "vixen", and the common law made such an impression upon our language that if one takes the trouble to look up the definition of any of these words in almost any of our modern dictionaries one will still find that they are applied, either exclusively or especially, to noisy, quarrelsome *women.*

It is our conclusion, therefore, that at common law only women can be indicted as "common scolds" and, since this is strictly a common-law crime in Pennsylvania, that a man may not be so indicted.

We recommend to the legislature that it take steps to make the law apply to men as well as women.

### Order of court

And now, to wit, January 6, 1945, for the reasons set forth in the opinion filed herewith, the indictment in this case is hereby quashed.